## Pennsylvania Coal Co. *versus* Winchester.

1. A patent granted by the Commonwealth under the provisions of the Act of April 11th, 1848, (P. L., 533,) entitling the patentee to the coal and minerals under the bed of a navigable river from low water mark on one shore to low water mark on the opposite shore, does not give the patentee the right to mine minerals under an island within the boundaries of his grant which, under prior existing laws, was subject to application and sale. Ejectment can be maintained by a subsequent grantee of said island against said patentee for minerals beneath the island to low water mark as far as the same extended at the date of application and survey of said patentee. plication and survey of said patentee.

2. The evidence in this case held sufficient to justify the finding that at the time of issuing the warrant for the bed of the river the island to low water mark comprised as much land as described in the writ of ejectment.

April 15th, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and CLARK, JJ. GREEN, J. absent.

ERROR to the Court of Common Pleas of *Luzerne county:* Of January Term 1885, No. 458.

This was an action of ejectment by Anna L. C. Winchester, widow, and Martha C. Winchester and Byron B. Winchester, by his guardian Martha C. Winchester, heirs of Stephen S. Winchester, deceased, against the Pennsylvania Coal Co. et al. to recover a certain tract of land, being an island, in the Susquehanna river in Exeter township, Luzerne county. Plea, not guilty.

On the trial, before WOODWARD, J., the following facts appeared: In 1849 patents were granted to Thomas J. Rehrer for two warrants of 100 acres each on the bed of the Susquehanna river, in accordance with the provisions of the Act of April 11th, 1848 (P. L. 533,) authorizing the digging or mining of minerals etc., under the bed of navigable rivers. This title in 1851 became vested in the Pennsylvania Coal Company.

In 1870 a patent was granted to Stephen S. Winchester for Wintermoot island, in the Susquehanna river, containing 37 acres $58\frac{9}{10}$ perches. This land was within the bounds of the grant to the Pennsylvania Coal Company.

Plaintiffs' witnesses estimated the size of Wintermoot island to have been in 1848 from 12 to 25 acres, while defendants' witnesses testified it contained but from 2 to 10 acres.

Defendants presented, inter alia., the following points :—

2. That no matter what was the condition of Wintermoot island at the date of defendants' warrants and surveys, the title being still in the Commonwealth, the grant of the Commonwealth to defendants was conclusive against her, and she could make no further conveyance to affect such grant, islands not being excepted under the Act of 1848. Refused. (First assignment of error.)

4. That under the Act of 1848, all the area included within lines beginning at a point designated in these warrants at low water mark on the bank of the river, pursuing the course of said river at low water mark as designated in said warrants, then at right angles across said river to low water mark, and thence along the other shore of the river at low water mark to a point opposite the place of beginning, thence across said river to place of beginning, is the bed of the river, and a warrant therefor embraces all islands, bars, and sand banks not granted by the Commonwealth prior to the date of such warrants.

*Answer.* That point in its length and breadth we cannot affirm; a portion of it might have been affirmed if it stood alone. We decline to affirm it. (Second assignment of error.)

Plaintiffs submitted, inter alia, the following points :—

4. If the jury find that in 1848 there was an island in the bed of the river called Wintermoot island, and that the same contained forty perches of arable land, exclusive of rocks, four feet above low water mark, then the river warrants laid out by Dr. Ingham should have stopped at low water mark, around the shore of the island, and no part of the land above low water mark could be affected by the surveys and patents under which defendants claim, and the verdict must be for the plaintiffs for so much land as was above low water mark at that time. Affirmed. (Fourth assignment of error.)

2. The plaintiff has shown title to the land described in the

writ, and is entitled to recover possession of the same against the Pennsylvania Coal Company, if the jury believe that the said land was above low water mark in 1848. Affirmed. (Fifth assignment of error.)

3. The Act of 1848, under which the said company claims title, conferred no power to sell rights under land not in the bed of the river, and if the jury find that the land in dispute was in fact not in the bed of the river in 1848, but was an island above low water mark, the plaintiffs are entitled to recover. Affirmed. (Sixth assignment of error.)

5. The jury may find for the plaintiffs under the evidence, for the land described in the writ, being the Winchester and Culver survey, or for so much thereof as they may believe was not in the bed of the river in 1848, defining the amount in such a way as to render its identification possible. Affirmed. (Seventh assignment of error.)

The court charged the jury, inter alia, as follows :—

" Was there such an island as the statute contemplates, at the place named, in 1848? If you find in the affirmative, that there was, we say to you that the survey of the river right, or warrant, being confined to the bed of the river would not include land constituting such an island. In other words, a survey of the bed of the river such as defendants claim under, would stop at this island and follow its courses and distances around and not go over or through it. This brings us naturally to the other question ; what is the bed of the river? It is said this is a question for the court, but I think the jury know about as much in regard to it as the court can know." (Third assignment of error.)

· · · · · " As we have said to you, gentlemen, plaintiffs have shown themselves entitled to your verdict for the surface. About this there is no controversy. We have also said to you, that although the writ in this case describes thirty-seven acres, it will be incumbent upon you to find how much of this thirty-seven acres, under the views given you, already existed in 1848, and to say if you find for the plaintiffs, how many acres do you find for them ; and as to all for which you do not find in favor of the plaintiffs, you will say you find for the defendant, the Pennsylvania Coal Company. This may seem a little complicated because of the peculiarity of the case, but I think you comprehend it. As to the surface there is no dispute ; for that the plaintiffs are entitled to a verdict. Whether or not they are entitled to recover further, depends upon what you believe in regard to the testimony. You have a right, if you find for the plaintiffs at all, to find for the whole amount described in the writ, to wit, thirty-seven acres. Or you may find for such portion of it as you believe, under the general in-

structions we have heretofore given you, was not properly included in the surveys of 1848 and 1849, which the defendants hold. Thus you may, under certain views of the evidence, find in your verdict a portion of the land for the plaintiffs and the rest for the defendants." (Eighth assignment of error.)

Verdict and judgment for plaintiffs for the land described in the writ; whereupon the Pennsylvania Coal Company, one of the defendants, took this writ assigning for error the answer to plaintiffs' and defendants' points as above noted and the portions of the general charge quoted above.

*Andrew H. McClintock* (with whom was *Henry M. Hoyt*), for plaintiff in error.—The interest created by the Act of 1848 in underlying minerals was a fee: Caldwell *v.* Fulton, 7 Casey, 475. The warrants run under the island as well as under the bed of the river; nothing in the policy, purpose or language of the Act of 1848 prevented the location of river warrants taking effect under any unappropriated land lying in the bed of the river between low water mark on the banks. Between high and low water the rights of riparian owners are modified: Wainwright *v.* McCullough, 13 P. F. S., 66; Carson *v.* Blazer, 2 Binney, 475; and the bed of the river cannot be said to extend only to low water mark. The warrant to defendants at least included the shore of the island: Elliot *v.* Elliot, 5 Binney, 1; Howard *v.* Ingersoll, 13 Howard, 381. The portions of the charge of the court assigned as error led the jury to find an excessive verdict.

*Henry W. Palmer* (with whom were *George K. Powell* and *D. L. Patrick*), for defendants in error.—The Act of 1848 under which the warrants were issued gives power to sell only the "bed of the river," and the surveys could not extend beyond "low water mark."

Mr. Justice TRUNKEY delivered the opinion of the court May 11th, 1885.

Prior to 1848, statutes had been enacted providing for application, survey and grant of islands in the river Susquehanna. They were not subject to appropriation at the prices paid for other lands, but the value of each was to be ascertained by the board of property, and in no instance to be sold for less than eight dollars by the acre. What shall be deemed an island for purpose of sale by the Commonwealth, is defined in the statute; it must "be at least four feet high above common low water, containing at least forty perches of ground exclusive of rocks, be susceptible of cultivation in grain or esculent roots in common seasons, by their growing and becoming

maturely ripe." Sand or gravel bars, or accumulations of mud, which do not come under said description, shall be a part of the public highway. No warrant of survey shall be for a less quantity than the whole of the island—the sale and grant cannot be limited to the ground, exclusive of rocks, susceptible of cultivation in grain or esculent roots.

The Act of April 11th, 1848, provided for application, survey and grant of a quantity not exceeding one hundred acres of the bed of any navigable river, beginning at a point designated in the application, at low water mark on the bank of said river and pursuing the course of said river at low water mark to a designated point, thence at right angles across said river to low water mark, thence along the shore at low water mark to a point opposite the place of beginning. A warrantee under this Act has the "right to dig and mine for iron, coal, limestone, sand and gravel, fire-clay and other minerals," but he takes no title to the soil or sand or anything in the bed of the river. His grant is confined within the limits of low water mark, and this recognizes the principle that a grant of land by the Commonwealth, bounded on one side by a large navigable river, vests in the grantee the entire land to the line of low water mark. The riparian owner has the right of soil to ordinary low water mark of the river, subject to the public right of passage for navigation, fishing and other proper use of the highway to the mark of ordinary high water: Wood *v.* Appal, 63 Pa. St., 210. Between high and low water mark, the title of the riparian owner is qualified, being subject to the right of navigation over it and improvement of the stream as a highway: Wainwright *v.* McCullough, Id., 66. In that case it was said that the land lying between the low water line of the island as fixed by the commissioners, and the top of the island bank, is a part of the island. And in Hartley *v.* Crawford, 32 P. F. S., 478, it was again remarked that the riparian rights of the owner of an island attached to the land between the bluff bank to which the survey came and the ordinary low water mark; and subject to the rights of the public, the owner of the island might use the sandy or pebbly beach or shore. Although the principle may not have been necessary to the decision in Wainwright *v.* McCullough, or in Hartley *v.* Crawford, and therefore not authoritatively ruled, its assertion shows how naturally it comes into view in considering the bounds of an island as defined in the statutes providing for sales of that kind of land. No difference is made in the laws providing for surveys and sales of land, respecting the shore of the main land and the shore of islands. It would be difficult to conceive a reason for a difference. In either case, the river being a bound, the grantee takes to low water mark, sub-

[Penna. Coal Co. v. Winchester.]

ject to the right of the public to use the river as a highway, but as to all below the surface, without clog or qualification. If the title to any of the land remained in the Commonwealth, a grant of the minerals under the bed of a river, within the limits of low water mark, would be held as strictly within said limits as if all the land bordering on the river had been disposed of to purchasers. So also if the Act of 1848 does not apply to minerals under islands in the river Susquehanna, then owned by the Commonwealth, said islands embrace all within the limits of low water mark.

The Act of 1848 contained no repealing clause, and repealed no prior statute by implication, unless there was such positive repugnancy between its provisions and the prior statute, that they cannot stand together or be consistently reconciled. It is general, applying to all navigable rivers, and the statutes relating to sale of islands in the river Susquehanna apply to no other; but the repugnancy between a local statute and a subsequent general statute must be as strongly marked, to say the least, to repeal by implication, as if both were general: Sifred v. Commonwealth, 104 Pa. St., 179; City of Harrisburg v. Sheck, Id., 53. No mention is made of islands in the Act of 1848. On its face, the warrantee is entitled to the minerals under the bed of the river, without exception. Of course, it was not intended that he should have a right to dig and mine and carry away the minerals in the islands which had been already granted. The presumption is against an intent to invade vested rights of property. Then, the statute must be so construed that the bed of the river between the shores of the main land, shall not include land, called islands, which had been previously granted to purchasers under the laws of the state. It seems equally clear that by like construction, it shall not include islands which, under prior existing laws, were subject to application and sale. Those laws provided for the sale of land, without exception of any part thereof; the Act of 1848 provided for the sale of minerals under a river bed—under land covered with water. The purpose of the former was a sale of the entire land; of the latter, a sale of only the minerals under the surface. Title to the surface remains in the Commonwealth as to all grants under the Act of 1848. There is no intent that said Act shall apply to any land or island which were subject to sale under other laws. We are not convinced that the court erred in any of the rulings set forth in the first six specifications of error.

Nor was there error in the instructions made the subject of complaint in the seventh and eighth specifications. The jury were instructed that they could find for the plaintiff for the land described in the writ, or so much thereof as they believed,

13 OUTERBRIDGE—37

under the evidence, was not in the bed of the river in 1848. They were told very plainly that it was incumbent on them to find how much of the thirty-seven acres described in the writ existed in 1848, and that the plaintiff could recover no more than existed at that date. This related to the minerals —there was no controversy about the surface. The defendants particularly complain of the remark: " You have a right, if you find for the plaintiff at all, to find for the whole amount described in the writ, to wit, thirty-seven acres ; " and insist that there was no testimony to justify such instruction.

By actual survey the island contains forty-seven acres and one hundred and fifty perches within the limits of low water mark; twenty-three acres being four feet above low water. In 1870 it contained thirty-seven acres.   There is no evidence of a survey in 1848, or near that time, and it seems difficult to find proof of the quantity at that date. The defendants' counsel truly say, that " the highest guess of any witness did not put the extent of the island in 1848 above twenty-five acres, sand bars, gravel bars and all."   Although the witnesses were intelligent and credible as to facts which they remembered, their guessing as to quantity was exceedingly wild, and the jury must have rested mainly upon their description of the island, in connection with the surveys, to ascertain the quantity. By noting the testimony of a few it will be seen how fanciful were the estimates of quantity, and that some had recollection of the appearance of the island for years prior to 1848.   Dr. Ingham who made the surveys of the river bed in that year, at a very low stage of water, noticed nothing more where the island now is, than a gravel bar, with willows and a few sprouts of buttonwood growing thereon ; not over five acres, probably less ; it was quite a small bar compared with what he has seen it within a year or two, " quite a trifle both in height and extent, every way different."   Another witness called by defendants, says that in 1848, " it was a gravel bar with some willows on the lower end of it, on the lower corner; it might have contained three or four acres at ordinary low water mark; " and not a foot of it was capable of cultivation.   He also thinks the island did not change very much, except the west bank, and he did not notice the increase until a very few years back. He does not think the island is very much larger now than it was in 1848, only there is soil on the lower end of it.   That witness was familiar with this island from his boyhood.   A witness called by the plaintiff says that in 1832, maple-brush, willows, birch, grape-vine, and woods of different kinds were growing on the island ; there were maple trees on it five or six inches through, an ice freshet killed nearly all the brush, but it grew up again ; thinks there were twenty acres in it, and that

it has not changed since 1848, except that it has made a little at the upper end, quite a little on the lower end, considerable towards the west side, and is some higher. Another witness says that in 1848 the east side of the island seemed pretty much the same as now, there is a little more gravel beach on the upper end, and a little more on the lower end, than there was then; otherwise it seems to be about the same. Such is the pith of the testimony of numerous witnesses, and it was for the jury. The land described in the writ is about three-fourths of the quantity now in the island, and the jury might infer from the testimony that there was so much in 1848.

Judgment affirmed.